UNITED STATES of America, Appellee,

v.

Maggie Louise TURPIN, Appellant.

UNITED STATES of America, Appellee,

v.

Darryl Lee WILLIAMS, Appellant.

Nos. 90–1628WM, 90–1671WM.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 8, 1990.

Decided Nov. 26, 1990.

R. Steven Brown, Springfield, Mo., for Turpin.

T. Patrick Deaton, Springfield, Mo., for Williams.

Richard E. Monroe, Springfield, Mo., for appellee.

Before LAY, Chief Judge, BRIGHT and TIMBERS,* Circuit Judges.

TIMBERS, Circuit Judge:

Appellants Maggie Louise Turpin and Darryl Lee Williams appeal from judgments entered April 13, 1990, in the Western District of Missouri, Russell G. Clark, District Judge, convicting them of narcotics offenses. Their appeals bring up for review the propriety of their sentences.

Appellants Turpin and Williams were convicted by a jury of one count of knowingly possessing with intent to distribute 50 grams or more of a substance containing cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) (1988), and one count of conspiracy to possess cocaine with intent to distribute it in violation of 21 U.S.C. § 846 (1988). Sentences were imposed pursuant to the Sentencing Guidelines. Turpin was sentenced to concurrent terms of 324 months on both counts, followed by a 5 year term of supervised release. Williams was sentenced to concurrent terms of 360 months on both counts, followed by a 5 year term of supervised release.

On appeal, Turpin contends that the evidence was insufficient to support her convictions. Williams contends that the district court erred in denying his motion to suppress evidence relating to his previous arrest for cocaine possession in Detroit. Turpin and Williams both challenge the district court's application of the Sentencing Guidelines.

For the reasons that follow, we affirm the judgments of conviction and the sentences imposed.

## I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

On February 24, 1989, the Springfield, Missouri police obtained a search warrant to search room 413 at the Springfield Holiday Inn, as well as a red Chevrolet Beretta and a black Chevrolet Beretta. Police officers stopped the red Beretta at a Burger King restaurant about a block from the motel. Appellants Turpin and Williams were in the car along with Antonio Corey (J.D.) and Gary Jerome Davis (Twin). Williams identified himself to the police as Anthony Bostic. No narcotics or weapons were found in the car or on the person of any of its occupants.

Soon thereafter, room 413 of the Springfield Holiday Inn was searched. That room was registered in Turpin's name. Williams paid the motel bill. Upon entering the room, the officers found white envelopes and small blue coin bags on a table. In addition, hidden beneath a bed, the officers found a briefcase containing more than 150 grams of cocaine, a Western Union mailgram receipt signed by Turpin, a razor blade, and $4,700 in cash. The officers also found a portfolio containing jogging suits, a woman's clothing, an address book, another Western Union mailgram receipt, a GMC protection plan for an automobile, and an application for a driver's license and identification in the name of Darryl Williams.

Williams was charged in the state court, where he identified himself as Anthony Bostic. Williams was held for three months before the State dismissed the charges against him and released him from jail.

On April 18, 1989, Turpin was named in a one count indictment that charged her with possession with intent to distribute 50 grams or more of a controlled substance containing a cocaine base in violation of 21 U.S.C. § 841(a)(1) (1988). That prosecution ended in a mistrial when the jury was unable to reach a verdict. During her testimony at that trial, Turpin referred to Williams as Anthony Bostic.

On September 12, 1989, Turpin and Williams, the latter's true identity having been discovered, were named in a two count superseding indictment. Count one charged them with possession with intent to distribute 50 grams or more of a con-

---

* Of the Second Circuit, sitting by designation.

trolled substance containing a cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) (1988). Count two charged them with conspiracy to possess cocaine with intent to distribute it in violation of 21 U.S.C. § 846 (1988).

Deanna Lewis was one of the prosecution's principal witnesses at trial. On February 6, 1989, the police had executed a search warrant at Lewis' apartment. They found a small amount of crack cocaine and a Smith & Wesson 9 millimeter pistol in the apartment. Lewis did not own the gun. She eventually agreed to cooperate with the government. In exchange for her cooperation, all charges against her were dropped.

Lewis testified that she lived in Springfield, Missouri during January and February 1989. In January 1989, she traveled with her boyfriend, Mark Pitts, to Detroit, Michigan. In Detroit, she met appellant Williams, who was introduced to her as "Geeter," and another man, who was introduced to her as "Twin." Williams and Twin accompanied Lewis and her boyfriend back to Springfield.

About one week after her return from Detroit, Lewis saw Williams and Twin in Springfield. Turpin, who was Williams' girlfriend, was also present on that occasion. Williams and Twin wanted to use Lewis' apartment as a base for a narcotics selling operation. Turpin encouraged Lewis to permit her apartment to be used for that purpose. Lewis agreed to allow them to use her apartment in exchange for a fee, which was never paid.

Lewis testified that appellants Turpin and Williams, along with Twin and J.D., used her apartment as their base for processing cocaine into crack and selling it. Turpin did not participate in cooking the cocaine, but did participate in selling it and also handled the money proceeds from the drug sales. On one occasion in February 1989, Lewis heard Williams state that he had been "arrested at the [Detroit] airport trying to bring dope to Springfield."

Lewis sold crack at the direction of the group, and personally witnessed Williams sell cocaine on over 50 occasions and Turpin sell cocaine on 6 to 10 occasions. Members of the group drove a red Chevrolet Beretta and a black Chevrolet Beretta. Lewis saw in the trunk of the red Beretta the briefcase that was recovered from Turpin's motel room. Turpin handled the briefcase.

Occasionally, drug orders were received on a telephone answering machine located in Lewis' apartment. Appellants would fill these orders by delivering drugs to their customers in the red Beretta.

Anthony Whitehead, a convicted felon, drug user, and paid informant, testified that he witnessed appellants completing drug transactions from a Beretta on two occasions. The crack that they sold was packaged in blue plastic coin bags. Payment was made in cash. On one occasion, Whitehead observed a Smith & Wesson 9 millimeter pistol in the Beretta between Williams and Turpin. Whitehead also observed a customer complaining to Turpin about being cheated. He was paid $100 for the information he gave to the police in the instant case.

Karen Fletcher, the manager of Lewis' apartment, identified the briefcase in which the cocaine was found as a briefcase she saw in Lewis' apartment and in a Beretta that Turpin drove. Fletcher was paid $100 for giving the Springfield Police information.

Greg Morris, a 13 year veteran of the Wayne County Sheriff's Department, testified about events surrounding Williams' previous arrest for cocaine possession in Detroit. On February 3, 1989, Williams was in the Detroit City Airport. Morris was on assignment to a task force for narcotics interdiction at the same airport. Morris, his partner, Mary Taylor, and a police dog, who was trained to detect the presence of narcotics, were on duty in the airport on that day.

After working the luggage from an incoming Chicago flight, Morris and Taylor went with the police dog, a Belgian Malinois named Cora, to a security checkpoint through which all passengers wishing to board flights at the Detroit City Airport

must pass. The security checkpoint is located on the second level of the airport. An escalator, which carries passengers from the first level, leads directly to the security checkpoint. A staircase is located adjacent to the escalator.

Morris and Taylor were conversing with security personnel. When Williams, who was carrying a brochure for an airline ticket, came off the escalator and saw the checkpoint at which Morris was stationed, he appeared startled, abruptly turned around, ducked his head, and proceeded down the staircase.

Believing that Williams might be carrying a weapon or narcotics, Morris notified other police officers and proceeded down the staircase with Cora. Morris saw Williams conferring with two men, who later were identified as Twin and J.D. Twin and J.D. proceeded up the staircase, as Williams made a phone call from a public telephone on the first level. Morris thought this unusual since there were public telephones on the second level.

When Williams left the public telephone, Morris noticed an unusual bulge in Williams' pants. Morris approached Williams, displayed his credentials, and asked him to take a seat. Cora began to bark and became agitated, an indication that she detected the scent of narcotics. Morris informed Williams that he was going to frisk him since he believed that Williams was concealing a weapon in his pants. Upon discovering that the bulge was soft, Morris asked Williams if it was a colostomy bag. Williams replied that Morris knew what it was. Morris stated that he believed the bulge was narcotics and William's nodded affirmatively. A plastic bag containing more than 50 grams of cocaine was removed from Williams' pants. Williams also had a plane ticket to St. Louis. Williams was arrested and subsequently released pending chemical analysis of the seized substance and application for an arrest warrant.

Appellant Turpin testified in her own behalf. She was a resident of Ohio. She traveled to Springfield with Williams, J.D., and another individual at Williams' request

in January 1989. Turpin made two subsequent trips from Ohio to Springfield prior to her arrest. On one of these occasions, she picked Williams up in Detroit before traveling to Springfield. When she was in Springfield, she stayed at several motels with Williams. The rooms were registered in Turpin's name and paid for by Williams. She denied meeting Anthony Whitehead on any of the trips she made to Springfield.

Turpin had been addicted to crack over a two month period in 1986. She voluntarily checked herself into a rehabilitation center and attended Narcotics Anonymous meetings. She testified that she had not smoked crack since. She denied seeing any crack when she was with Williams. She further denied owning the briefcase that was found in her motel room, or ever seeing it prior to her arrest. She stated that she did own the portfolio that was recovered from her motel room.

Appellant Williams also testified in his own behalf. He testified that he was in the Detroit City Airport to meet a stranger when he was arrested. A friend was paying him $400 to do so. He stated that Anthony Bostic is the name of his cousin. He asserted that the police told him that was his name after they found that name on a piece of paper in his pocket. Williams denied knowing Anthony Whitehead. Williams further denied that he used, possessed or sold cocaine in Springfield.

Turpin's motion for a judgment of acquittal was denied by the district court. The jury returned guilty verdicts against Turpin and Williams on both counts of the indictment. Appellants were sentenced on April 13, 1990. Turpin was assigned a base offense level of 34 under the Sentencing Guidelines. The district court raised that offense level two levels for possession of a firearm, three levels for Turpin's role as a supervisor in the offense, and two levels for obstruction of justice. Accordingly, Turpin was sentenced based on an adjusted offense level of 41. She received concurrent sentences of 324 months on both counts, followed by a five year term of supervised release. Williams was also assigned a base offense level of 34. That

level was enhanced two levels for possession of a firearm, four levels for Williams' role as a leader of the criminal activity, and two levels for obstruction of justice. Accordingly, Williams was sentenced based on an adjusted offense level of 42 to concurrent terms of 360 months on both counts, followed by a five year term of supervised release.

These appeals followed.

## II.

We turn first to Turpin's contention that the district court erred in denying her motion for a judgment of acquittal since the evidence was insufficient to support the verdicts. In evaluating this claim, we consider the evidence in the light most favorable to the government, giving the government the benefit of all reasonable inferences that can be drawn from the evidence. We must uphold the verdicts if a reasonable jury could have found guilt beyond a reasonable doubt. *United States v. Patterson,* 886 F.2d 217, 219 (8th Cir.1989) (per curiam); *United States v. Matra,* 841 F.2d 837, 840 (8th Cir.1988). The evidence need not exclude every reasonable hypothesis other than guilt. *United States v. Schubel,* 912 F.2d 952, 955 (8th Cir.1990); *United States v. Marin–Cifuentes,* 866 F.2d 988, 992 (8th Cir.1989).

### (A)

The government must prove knowing possession of cocaine and the intent to distribute it to sustain a conviction under 21 U.S.C. § 841(a)(1) (1988). *Patterson, supra,* 886 F.2d at 219; *Matra, supra,* 841 F.2d at 840. Turpin contends that the government has not proven either element beyond a reasonable doubt. She asserts that the evidence shows merely that she associated with drug dealers, but does not show that she was a willing participant in their activities. We disagree with Turpin's characterization of the evidence.

■ The government may prove either actual or constructive possession of contraband to satisfy the possession requirement of § 841(a)(1). *Schubel, supra,* 912 F.2d at

955; *Matra, supra,* 841 F.2d at 840. "A person has constructive possession of contraband if [s]he has ownership, dominion or control over the contraband itself, or dominion over the premises in which the contraband is concealed." *Schubel, supra,* 912 F.2d at 955; *Matra, supra,* 841 F.2d at 840. Constructive possession may be joint, rather than exclusive. *United States v. Brett,* 872 F.2d 1365, 1369 (8th Cir.), *cert. denied,* 110 S.Ct. 322 (1989).

■ There was sufficient evidence to demonstrate Turpin's constructive possession of the cocaine. The cocaine was found in a briefcase in a motel room that was registered in Turpin's name. Other items belonging to Turpin were found in the motel room, such as her address book and her clothing. The briefcase that contained the cocaine also contained a mailgram receipt that Turpin had signed. Furthermore, the testimony of Deanna Lewis and the manager of her apartment, Karen Fletcher, indicated that Turpin had exercised dominion and control over that briefcase in the past. A reasonable jury could have concluded from the evidence presented at trial that Turpin was in constructive possession of the cocaine.

■ The intent element of § 841(a)(1) may be proven by either direct or circumstantial evidence. *Patterson, supra,* 886 F.2d at 219; *Matra, supra,* 841 F.2d at 841. In the instant case, testimony indicated that Turpin had sold cocaine on previous occasions. The jury could infer intent from Turpin's past conduct. *United States v. Lewis,* 759 F.2d 1316, 1349 (8th Cir.), *cert. denied,* 474 U.S. 994 (1985). Moreover, evidence of intent "may be inferred from such things as the possession of a large quantity of a controlled substance, its high purity level, the presence of paraphernalia used to aid in its distribution, large sums of unexplained currency, and the presence of firearms." *Matra, supra,* 841 F.2d at 841. In the instant case, Turpin was found to be in constructive possession of over 150 grams of between 86 and 71 percent pure cocaine base. Furthermore, the police recovered $4,700 in cash from the briefcase that contained the cocaine and also found

small plastic bags of the type that testimony indicated previously had been used to package cocaine. There was ample evidence presented at trial from which the jury could have inferred intent.

We hold that the district court did not err in denying Turpin's motion for a judgment of acquittal on the count charging her with violating § 841(a)(1) and (b)(1)(A), since a reasonable jury could have found that Turpin was in constructive possession of the cocaine found in her motel room and that she intended to distribute it.

### (B)

Turpin also contends that there was insufficient evidence to convict her on count two, which charged her with conspiracy to possess cocaine with the intent to distribute it in violation of 21 U.S.C. § 846 (1988). We hold that there was sufficient evidence to convict her of that charge.

██ To sustain Turpin's conviction under § 846, the government had to prove that "[s]he entered into an agreement with at least one other person and that the agreement had as its objective a violation of the law." *United States v. Foote*, 898 F.2d 659, 663 (8th Cir.), *cert. denied*, 111 S.Ct. 112 (1990). The government is not required to prove the commission of any overt acts in furtherance of the conspiracy to sustain a conviction under § 846. *United States v. Figueroa*, 900 F.2d 1211, 1218 (8th Cir.), *cert. denied*, 110 S.Ct. 3228 (1990); *United States v. Covos*, 872 F.2d 805, 809–10 (8th Cir.), *cert. denied*, 110 S.Ct. 124 (1989). The existence of a conspiracy may be proven entirely through circumstantial evidence. *Foote, supra*, 898 F.2d at 663.

██ The testimony of Deanna Lewis, a member of the conspiracy, was sufficient to establish the existence of a continuing conspiracy to distribute cocaine in Springfield, whose members operated out of her apartment. "Once a conspiracy was proved, even slight evidence connecting [Turpin] to the conspiracy would be sufficient to support [her] conviction." *Id.* Lewis' testimony implicated Turpin as a member of that conspiracy. The testimony indicated that Turpin encouraged Lewis to allow the conspirators to use her apartment, sold cocaine for the group, and handled the money proceeds from the cocaine sales. The evidence of Turpin's involvement in the conspiracy was sufficient.

We hold that the district court did not err in denying Turpin's motion for judgment of acquittal on count two, charging her with conspiracy under § 846, since there was sufficient evidence to convict her on that charge.

### III.

We turn next to Williams' contention that the district court erred in admitting evidence of his prior arrest for cocaine possession in the Detroit City Airport. Williams contends that the evidence obtained during his arrest in Detroit was obtained in violation of his fourth amendment rights and therefore was inadmissible. We disagree.

██ We review the district court's factual determinations under a clearly erroneous standard. The district court's determination as to whether the fourth amendment was violated is subject to *de novo* review. *United States v. Hernandez*, 854 F.2d 295, 297 (8th Cir.1988).

██ Williams contends that reasonable suspicion did not support the police officer's investigative detention of him in the Detroit City Airport. Law enforcement officers may conduct a limited investigative detention upon reasonable suspicion that a crime has been or is about to be committed. *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Drinkard*, 900 F.2d 140, 143 (8th Cir.1990).

The first issue that we must consider is whether an investigative detention occurred that implicated the fourth amendment. A consensual encounter between a law enforcement officer and a citizen does not implicate the fourth amendment. *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion). Such an encounter becomes a *Terry* stop requiring reasonable suspicion "when, considering all the circumstances, a reasonable person would be·

lieve that he is not free to leave." *Hernandez, supra,* 854 F.2d at 297. We find that Williams would not have felt free to leave once Morris approached him with the dog, displayed his credentials and requested that he sit.

■ Having determined that an investigative detention occurred, we must now determine whether Morris had reasonable suspicion that Williams was engaged in criminal activity to justify detaining him. The district court found that Williams' "abrupt change of direction to avoid a security checkpoint" justified the stop. We agree with the district court.

Reasonable suspicion must be based on "specific and articulable facts." *Terry, supra,* 392 U.S. at 21 We consider the facts in the context of the totality of the circumstances and also consider them in light of the significance that a law enforcement officer experienced in detecting criminal activity would attach to them. *United States v. Nunley,* 873 F.2d 182, 185 (8th Cir.1989); *United States v. Campbell,* 843 F.2d 1089, 1093 (8th Cir.1988).

The police officer, Morris, had reasonable suspicion to justify his investigative detention of Williams. Williams' alarm upon seeing the security checkpoint at which Morris and the police dog were stationed, his subsequent erratic behavior, and the unnatural bulge in Williams' pants justified Morris' belief that Williams might be engaged in criminal activity. *Cf. Nunley, supra,* 873 F.2d at 185 (nervous state and erratic behavior in airport coupled with fact that defendant purchased one way ticket and was traveling without baggage justified *Terry* stop). Williams did not exhibit the sort of behavior that would "describe a very large category of presumably innocent travelers." *Reid v. Georgia,* 448 U.S. 438, 441 (1980) (per curiam).

The district court found that the fact that the police dog alerted for narcotics raised the level of suspicion to probable cause. Williams contends that the dog sniff itself was a search. In *United States v. Place,* 462 U.S. 696 (1983), the Supreme Court held that a dog sniff of luggage did not constitute a search implicating the fourth amendment. The Court reasoned that a dog sniff is less intrusive than a typical search. Furthermore, the information provided by a dog sniff is limited. It merely discloses the presence or absence of contraband. *Id.* at 707 The Court also observed that a dog sniff of luggage does not subject its owner to embarrassment or inconvenience. *Id.* ˙ The Court has not ruled on whether a dog sniff of a person constitutes a search. *But see United States v. Jacobsen,* 466 U.S. 109, 138 (1984) (Brennan, J., dissenting) (danger that Court's fourth amendment analysis would allow indiscriminate dog sniffs of people); *Place, supra,* 462 U.S. at 720 (Brennan, J., concurring) (dog sniff of a person constitutes search). Our sister circuits have reached varying conclusions as to whether any dog sniff does not constitute a search since it only reveals the presence or absence of contraband. *E.g., United States v. Colyer,* 878 F.2d 469, 473–79 (D.C.Cir. 1989) (dog sniff outside sleeper compartment on train does not constitute a search; if it were a search would be justifiable based on reasonable suspicion); *United States v. Whitehead,* 849 F.2d 849, 855–57 (4th Cir.) (dog sniff inside sleeper compartment on train justified based on reasonable suspicion), *cert. denied,* 488 U.S. 983 (1988); *United States v. Thomas,* 757 F.2d 1359, 1366–67 (2d Cir.) (dog sniff of private residence constitutes a search), *cert. denied,* 474 U.S. 819 (1985); *see also Horton v. Goose Creek Ind. School Dist.,* 690 F.2d 470, 479 (5th Cir.1982) (pre *Place* decision holding that dog sniff of student's person constitutes a search that can be justified based on reasonable suspicion), *cert. denied,* 463 U.S. 1207 (1983). We need not decide the issue of whether the dog sniff of Williams' person constituted a search under the fourth amendment and, if so, what level of suspicion was required to justify it, since we hold that Morris' actions were justified even absent the dog sniff.

■ Since Morris had reasonable suspicion to stop Williams, his subsequent frisk of Williams to determine if he was carrying a weapon was permissible. *Terry, supra,* 392 U.S. at 27. Upon discover-

ing that the bulge in Williams' pants was soft, Morris asked him if it was a colostomy bag. Williams responded that Morris knew what it was. Williams nodded affirmatively when Morris stated that he thought it was narcotics. This gave Morris probable cause to arrest Williams. *Cf. United States v. Mancini,* 802 F.2d 1326, 1329–30 (11th Cir.1986) (defendant's suspicious behavior in airport combined with defendant's implicit admission that he was carrying drugs gave officers probable cause to arrest); *United States v. Ilazi,* 730 F.2d 1120, 1127 (8th Cir.1984) (defendant's suspicious behavior in airport combined with refusal to explain bulge in boots gave officers probable cause to arrest). The search of Williams that produced the plastic bag with cocaine in it was justified as a search incident to a lawful arrest. Such a search is valid "even if it is conducted before the actual arrest, provided that (1) the arrest and the search are substantially contemporaneous, and (2) probable cause to arrest existed before the search." *Id.* at 1126.

We hold that the district court did not err in denying Williams' motion to suppress evidence obtained during his Detroit arrest.

## IV.

This brings us to appellants' contentions concerning the application of the Sentencing Guidelines. Turpin contends that the district court erred in adjusting her offense level upward two levels for possession of a firearm, three levels for her role as a supervisor in the offense, and two levels for obstruction of justice. Williams contends that the application of the Sentencing Guidelines violated his due process rights. We address these claims in order. We find no merit in any of them.

### (A)

The district court's factual determinations in applying the Sentencing Guidelines will not be disturbed unless we find they are clearly erroneous. *United States v. Weaver,* 906 F.2d 359, 360 (8th Cir.1990) (per curiam). Turpin challenges the district court's two level upward adjustment

of her offense level for possession of a firearm during the commission of the offense pursuant to § 2D1.1(b)(1) of the Sentencing Guidelines.

The notes to § 2D1.1(b)(1) indicate that "[t]he enhancement for weapon possession ... should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b)(1), n. 3. The district court found that the pistol located in Lewis' apartment could not be attributed to Turpin. The court credited the testimony of Anthony Whitehead, who stated that he saw a Smith & Wesson 9 millimeter pistol in the Beretta between Turpin and Williams. We give "due regard" to the district court's determination of Whitehead's credibility. 18 U.S.C. § 3742(e) (1988).

■■■■ Mere presence of the gun is not sufficient to justify sentence enhancement. The government must prove a connection between the gun and the criminal activity. *United States v. Khang,* 904 F.2d 1219, 1225 (8th Cir.1990). This does not require a showing that Turpin "ever used or even touched the [gun]." *United States v. Luster,* 896 F.2d 1122, 1129 (8th Cir.1990). Constructive possession will suffice to justify an upward adjustment for possession of a firearm during the commission of an offense. *Id.* Moreover, the single gun may justify an enhancement of the sentences of both Turpin and Williams, since possession of a gun by either would suffice to justify an upward adjustment of the other's offense level if it was reasonably foreseeable that one of them would possess a gun in furtherance of the jointly undertaken criminal activity. *United States v. Barragan,* 915 F.2d 1174, 1179 (8th Cir. 1990).

■■■■ We previously have upheld upward adjustments when guns have been present in automobiles or houses connected with drug activity. *E.g., United States v. Figueroa,* 900 F.2d 1211, 1218 (8th Cir.) (gun present under seat in car defendant was driving), *cert. denied,* 110 S.Ct. 3228 (1990); *Luster, supra,* 896 F.2d at 1128–29

(unloaded rifle in living room during drug transaction); *United States v. Green,* 889 F.2d 187, 189 (8th Cir.1989) (gun present in defendant's apartment in which drug sales were transacted); *United States v. Koonce,* 884 F.2d 349, 353 (8th Cir.1989) (gun present in defendant's pickup truck). In the instant case, the fact that the gun was accessible to Turpin in the Beretta from which evidence indicated that drug sales had been transacted supports the conclusion that the gun was connected to the conspiracy. Moreover, we previously have "recognized that firearms are 'tools of the [drug dealer's] trade.'" *Koonce, supra,* 884 F.2d at 354 n. 8 (citation omitted). In light of the foregoing, we find a sufficient nexus between the presence of the gun and Turpin's criminal activity. We hold that the district court's finding that Turpin possessed a gun in connection with the offense, justifying a two level upward adjustment in her offense level, was not clearly erroneous.

■ Turpin next challenges the district court's three level upward adjustment for her role as a supervisor in the offense pursuant to § 3B1.1(b) of the Sentencing Guidelines. Section 3B1.1(b) provides for an increase of three offense levels "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants...."

Initially, we observe that the district court's determination that there were five or more participants in the criminal activity was not clearly erroneous. Evidence indicated that the two appellants, together with Twin, J.D., Deanna Lewis, Mark Pitts, and several others participated in the drug operation.

Several factors justify the district court's conclusion that Turpin's supervisory role merited a three level enhancement. The evidence indicated that Turpin encouraged Lewis to permit the use of her apartment as a base for the criminal activity. Moreover, the fact that Turpin had responsibility for handling the proceeds from the drug sales supports the conclusion that she was a manager or supervisor. *Figueroa, supra,* 900 F.2d at 1219. We hold that the district court's finding that Turpin was a manager or supervisor, justifying a three level increase in her offense level, was not clearly erroneous.

■ Turpin also challenges the district court's two level enhancement of her offense level for obstruction of justice pursuant to § 3C1.1 of the Sentencing Guidelines. The court based its finding on the fact that Turpin referred to Williams as Anthony Bostic at her first trial. Turpin's address book, which was recovered from her motel room, indicated that she knew Williams' true name. Moreover, there was no evidence that Anthony Bostic was a legitimate alias for Williams, rather than an assumed name designed to mislead investigators. Misleading investigators as to the identity of accomplices justifies an enhancement for obstruction of justice. *United States v. Penson,* 893 F.2d 996, 998 (8th Cir.1990); *see also United States v. Holland,* 884 F.2d 354, 359 (8th Cir.) (encouraging co-defendant to conceal the identity of accomplices justifies obstruction of justice enhancement), *cert. denied,* 110 S.Ct. 552 (1989). Since the authorities did not know Williams' true identity, they were unable to connect him with the incriminating evidence found in Turpin's motel room and with his previous arrest in Detroit until Deanna Lewis agreed to cooperate. We hold that the district court's finding that Turpin obstructed justice, justifying a two level increase in her offense level, was not clearly erroneous.

(B)

■ Williams contends that his due process rights were violated by the district court's application of the Sentencing Guidelines. He claims that an Assistant United States Attorney assigned to the Drug Task Force in Springfield served a dual role in the state prosecutor's office. He asserts that the case against him in the state court was dismissed solely to gain a tactical advantage in the federal court. We disagree.

Williams' reliance on *United States v. Roberts,* 726 F.Supp. 1359 (D.D.C.1989) is

misplaced. In *Roberts,* the court held that the Sentencing Guidelines are *per se* unconstitutional since they transfer sentencing discretion from the judge to the prosecutor. *Id.* at 1366–68. We repeatedly have rejected that proposition. *United States v. Weaver,* 906 F.2d 359, 360 (8th Cir.1990) (per curiam); *Nunley, supra,* 873 F.2d at 186; *United States v. Brittman,* 872 F.2d 827, 828 (8th Cir.1989); *see also United States v. Sanchez,* 908 F.2d 1443, 1445–46 (9th Cir.1990) (Sentencing Guidelines do not violate due process); *United States v. Smith,* 727 F.Supp. 1023, 1029–30 (W.D.Va. 1990) (same).

The *Roberts* court also found a specific practice of the prosecutors in the District of Columbia violative of due process. The court found that the government essentially was transferring cases in which it was not prepared to proceed from the District of Columbia Superior Court to the federal court to start the speedy trial clock running anew. *Roberts, supra,* 726 F.Supp. at 1368. The court held that this conduct violated the defendants' due process rights since the government was manipulating cases "to achieve significant tactical advantages in order to defeat defendants' rights." *Id.* at 1369.

■ Williams' attempt to analogize his situation to *Roberts* fails. The fact that the federal government prosecutes a federal crime in a federal court that could have been or has been prosecuted as a state crime in a state court does not itself violate due process. *Abbate v. United States,* 359 U.S. 187, 194 (1959).

■ Williams points to two "tactical advantages" that he claims the prosecution gained by indicting him in the federal court after dismissing the case against him in the state court. First, Williams contends that he was subject to a harsher sentence in the federal court than would have been the case in the state court. That does not implicate the due process clause. Second, Williams contends that in the federal court the prosecution was spared from charging and proving beyond a reasonable doubt crimes that were considered in determining his sentence. We previously have held that

"[d]ue process does not require 'a right to trial by jury on each fact that results in an increase in a sentence,' *United States v. Barnerd,* 887 F.2d 841, 842 (8th Cir.1989), nor does '[t]he Constitution ... impose a particular standard of proof for factual determinations at sentencing hearings,' *United States v. Gooden,* 892 F.2d 725, 728 (8th Cir.1989), [*cert. denied,* 110 S.Ct. 2594 (1990) ]." *Luster, supra,* 896 F.2d at 1129.

In the instant case, the prosecution did not seek to deny Williams' rights by dismissing the case against him in the state court and indicting him in the federal court. On the contrary, the case originally was brought in the state court and dismissed because the authorities were unaware of Williams' true identity. They therefore were unable to connect him to the evidence seized in the motel room and in the Detroit airport.

We hold that the application of the Sentencing Guidelines did not violate Williams' due process rights.

V.

To summarize:

We hold that there was sufficient evidence to support the convictions of Turpin on count one, charging her with possession of 50 grams or more of cocaine with the intent to distribute it, and on count two, charging her with conspiracy to do so. We further hold that evidence seized during Williams' arrest in the Detroit airport was not obtained in violation of his fourth amendment rights and the district court did not err in admitting evidence of that arrest. Finally, we hold that the district court did not err in enhancing Turpin's sentence for weapon possession, for her role as a supervisor in the offense, and for obstruction of justice. The application of the Sentencing Guidelines did not violate Williams' due process rights.

Affirmed.